# UNITED STATES BANKRUPTCY COURT

# DISTRICT OF HAWAII

| | |
|---|---|
| In re<br><br>C&S ELECTRIC, INC.,<br><br>      Debtor. | Case No. 08-01855<br>Chapter 7 |
| WALTER Y. ARAKAKI, GENERAL CONTRACTOR, INC.,<br><br>      Plaintiff,<br><br>  vs.<br><br>C&S ELECTRIC, INC., et al.,<br><br>      Defendants. | Adv. Pro. No. 09-90059<br><br><br><br><br><br>Re: Docket No. 28, 32 |

## MEMORANDUM OF DECISION ON CROSSMOTIONS FOR PARTIAL SUMMARY JUDGMENT

In this adversary proceeding, the parties contest who owes how much to whom under a series of construction projects. The issues would make a difficult law school examination question.

## STATEMENT OF FACTS

Walter Y. Arakaki, General Contractor, Inc. ("Arakaki"), entered into a contract to build the "Waihee Line Booster MCC Replacement" project for the

Board of Water Supply of the City and County of Honolulu ("BWS"). Arakaki entered into a subcontract with C&S Electric, Inc. ("C&S"), under which C&S agreed to perform part of the work. C&S in turn entered into a contract with Consolidated Electrical Distributors, Inc. ("Consolidated"), pursuant to which Consolidated agreed to provide certain electrical equipment for the job.

Consolidated, C&S, and Arakaki also entered into a joint check agreement. The agreement provides that any invoice submitted by Consolidated to C&S "covering materials purchased for use" on the Waihee project "shall be paid . . . by a negotiable check drawn by [Arakaki] in the exact total of such unpaid invoice and made payable jointly to [C&S and Consolidated]." Arakaki promised to deliver the checks to Consolidated, and C&S agreed to endorse the checks and return them to Consolidated. The agreement states its purpose as follows:

> The sole purpose of this Joint Check Agreement is to provide for payment of invoices submitted by [Consolidated] on its sales of materials to [C&S] for use on the Project. This Agreement does not constitute an assignment of funds, and, except to the extent of payments actually received, the execution of this Agreement and the taking of such joint checks shall not affect nor otherwise impair any bond, lien or other creditor rights and remedies which [Consolidated] now has or may hereafter have arising from its sales to [C&S] of material for the Project.

C&S completed its work on the Waihee project and Arakaki owes C&S money for that work. The pending motions do not ask the court to determine the

U.S. Bankruptcy Court - Hawaii  #09-90059   Dkt # 56   Filed 07/16/10   Page 2 of 20

amount of Arakaki's obligation to C&S.

C&S did not pay Consolidated the full amount due under the supply contract. Consolidated claims that the unpaid amount is $64,894.41 plus interest, attorneys' fees, and costs.

Arakaki also entered into subcontracts with C&S on three other BWS jobs (the Maunalani, Makakilo, and Waipio projects). C&S did not fulfill its obligations under those subcontracts, and Arakaki claims that C&S owes damages on at least two of those jobs. The pending motions also do not seek a determination of the amount of these claims.

In October 2007, Arakaki informed C&S that "on July 1, 2007, [Arakaki] had been purchased" by Brian's Contracting, Inc. Other documents suggest that Brian's purchased only the Makakilo and Waipio jobs. There is no more information about the "purchase" in the record.

Central Pacific Bank ("CPB") claims a security interest in C&S' accounts. No one challenges the validity or perfection of that security interest.

On May 14, 2008, a Consolidated employee delivered to Arakaki a document entitled "Unconditional Waiver and Release Upon Final Payment," in which Consolidated purportedly acknowledged that it had been paid in full. Consolidated offers declaration testimony that the employee's supervisor

3

instructed him to deliver the release only in return for full payment of the balance due, and that the employee was not authorized to deliver the release without receiving simultaneous payment. Consolidated also points out (and Arakaki does not deny) that Arakaki refused to accept the waiver form for a variety of reasons.

## PROCEDURAL HISTORY

Arakaki's complaint in this adversary proceeding seeks a declaratory judgment that (a) Arakaki can set off its debt to C&S on the Waihee job against the amounts C&S owes Arakaki on the other jobs under federal bankruptcy law (count 1) and state law (count 2), (b), after applying the setoff, C&S owes money to Arakaki which Arakaki can assert as a claim in the C&S bankruptcy case (count 3), (c) Arakaki's setoff rights have priority over CPB's security interest (count 4), (d), if Arakaki's debt to C&S arose after C&S' bankruptcy filing, then that account is not subject to CPB's security interest and is not property of C&S' bankruptcy estate (count 5), and (e) Arakaki owes nothing to Consolidated (count 6).

CPB's counterclaim against Arakaki is the mirror image of Arakaki's claims against CPB.

Consolidated's counterclaim seeks a judgment against Arakaki for the unpaid amount owed under the joint check agreement.

Consolidated has moved for summary judgment that Arakaki owes it the

4

unpaid amount under the joint check agreement and that neither CPB nor C&S' bankruptcy estate has any claim to that money.

Arakaki has filed a crossmotion for summary judgment on counts 1, 2, and 4 of the complaint; i.e., that Arakaki has a valid right of setoff and that its setoff rights take priority over CPB's security interest.[1]

## DISCUSSION

### 1. Consolidated's Motion for Summary Judgment

#### A. The Amount of Consolidated's Claim

Because C&S and Consolidated entered into a fixed price contract, C&S owed Consolidated the contract price, minus an agreed upon discount of $10,000 and all amounts paid to Consolidated by or on behalf of C&S. Consolidated's motion and supporting evidence establishes that the amount is $64,894.41 plus interest. Consolidated is entitled to partial summary judgment on this issue.

#### B. Arakaki's Contentions about Specific Invoices

Arakaki points out that, under the joint check agreement, Arakaki is only obligated to pay Consolidated upon presentation of an "invoice . . . covering materials purchased for use on" the Waihee project. Based on this provision and the invoices, Arakaki makes three arguments.

---

[1] Arakaki does not argue that it can employ offset to reduce its liability to Consolidated.

First, Arakaki argues that some of the invoices are for services (such as set up and testing), not materials, and therefore are not covered by the joint check agreement. Consolidated replies that the "services" are integral to the materials it provided; in other words, C&S agreed to buy and pay for, and Arakaki expected to receive, not just raw materials, but electrical equipment that was properly assembled and in working order. I agree that Consolidated's interpretation of the joint check agreement is the only reasonable one.

Second, Arakaki argues that some of the unpaid invoices cover items that were apparently covered by prior invoices, and that the unpaid invoices therefore represent double billing. This issue is not relevant at this point. The invoices were presented for the purpose of obtaining progress payments before completion of the work. Now that the job has been finished, it does not matter whether some of the invoices were duplicates or were previously paid. Because Consolidated provided all of the materials and is charging no more than the total contract price (as discounted) minus all payments, C&S owes the balance to Consolidated as the final payment, no matter what the prior invoices say.

Third, Arakaki argues that it is not responsible for the invoice representing Consolidated's final billing, because that invoice merely represented the balance of the purchase price, not the cost of materials. This argument seems to imply that the

6

joint check agreement only covered Consolidated's cost and not its profit. I do not accept it.

Consolidated is entitled to partial summary judgment on this issue.

### C. Consolidated's Release

Arakaki and CPB point out that Consolidated signed a document purporting to release all of its claims. Consolidated contends that the person who delivered the document on its behalf lacked authority to do so and that Arakaki subsequently rejected the document. The factual dispute about the effectiveness of the release cannot be settled on a summary judgment motion.

Therefore, neither Consolidated nor Arakaki are entitled to summary judgment on this issue.

### D. Attorneys' Fees

There is no dispute that Consolidated's claims under the supply contract and the joint check agreement are an "action in the nature of assumpsit" within the meaning of Hawaii Rev. Stat. § 607-14. Partial summary judgment on this legal issue is appropriate. Arakaki correctly points out, however, that the amount of Consolidated's fee award under the statute cannot be determined until a final money judgment is entered.

7

### E. Implied Covenant of Good Faith and Fair Dealing

Consolidated argues that Arakaki breached the implied covenant of good faith and fair dealing. I reject this claim for two reasons.

First, there is no evidence that Arakaki's conduct was unreasonable or undertaken in bad faith. Arakaki denied that it owed any money to Consolidated and insisted that Consolidated prove its claims. Arakaki responded to Consolidated's final billing within a matter of days and responded promptly to Consolidated's demands. The failure to capitulate to an opposing party's demands is not, without more, a breach of the implied covenant.

Second, even if Consolidated could establish such a breach, it would not entitle Consolidated to any additional remedies. If Arakaki is correct that it did not breach the contract, then it was entitled to stand on its contractual rights and could not have breached the implied covenant by doing so. If Arakaki is wrong and it breached the contract, Consolidated could recover all of its damages on a breach of contract theory (including attorneys' fees to the extent authorized by Haw. Rev. Stat. § 607-14); a breach of the implied covenant would not give Consolidated any additional remedies.

Therefore, I will grant partial summary judgment in favor of Arakaki on this issue.

8

U.S. Bankruptcy Court - Hawaii   #09-90059   Dkt # 56   Filed  07/16/10   Page 8 of 20

F. Priority of CPB and Consolidated

CPB argues that, as the holder of a perfected security interest in C&S' accounts, CPB is entitled to receive any payments due from Arakaki, including any amounts covered by the joint check agreement. Consolidated argues that it is entitled to the payments covered by that agreement. This dispute turns on a surprisingly complicated legal question.

This is a question of state property and lien law, not federal bankruptcy law, and there are no Hawaii decisions on point.

The plain language of the Uniform Commercial Code suggests that the joint check agreement should be treated as a security agreement under article 9. The agreement was expressly intended "to provide for payment of invoices submitted by [Consolidated] on its sales of materials to [C&S] . . . ." This suggests that the parties intended to create an interest in the monies owed by Arakaki to C&S in order to secure C&S' obligation to pay Consolidated. This falls squarely within the statutory definition of a "security interest." Haw. Rev. Stat. § 490:1-201. If this is so, CPB has priority, because CPB's interest in the accounts is perfected and Consolidated's is not. Haw. Rev. Stat. § 490:9-322(a)(2).

Some decisions follow this reasoning. For example, Brown Wholesale Elec. Co., Inc. v. Trustees of Hawaii Electricians Annuity, 179 F.3d 829 (9th Cir. 1999),

9

U.S. Bankruptcy Court - Hawaii   #09-90059   Dkt # 56   Filed 07/16/10   Page 9 of 20

treated a joint check agreement as a security agreement. That case is arguably distinguishable, however, because the agreement expressly said it was a security agreement covered by article 9 that created a security interest in the equipment sold and its proceeds. See also Marandola v. Marandola Mechanical, Inc., 2004 WL 1542229 (R.I. Super. June 29, 2004).

The majority of decisions give priority to the beneficiary of the joint check agreement. See, e.g., Martin v. Amercable Corp., 990 F.2d 439 (8th Cir. 1993); In re Inca Materials, Inc., 880 F.2d 1307 (11th Cir. 1989) (per curiam); Mid-Atlantic Supply, Inc. v. Three Rivers Aluminum Co., 790 F.2d 1121 (4th Cir. 1986); In re Mastercraft Metals, Inc., 114 B.R. 183 (Bankr. W.D. Mo. 1990).[2]

The rationales given in these cases are not satisfactory.

Some courts reason that a joint check agreement is not subject to article 9 because it operates as an absolute assignment of the subcontractor's right to receive payment, not a transfer for security purposes. MidAtlantic Supply, 790 F.2d 1121; Elsa State Bank & Trust Co. v. Trevino, 2009 WL 1089462 (Tex. App. April 23, 2009); Aggregate Indus. Northeast Region, Inc., v. Mass Paving, Inc., 2006 WL

---

[2] Some of the cases which Consolidated cites were decided before the Uniform Commercial Code became effective. These cases cannot help interpret the U.C.C. Keenan Pipe & Supply Co., v. Shields, 241 F.2d 486 (9th Cir. 1956) (applying California law, where the U.C.C. became effective in 1965, Cal. U. Com. Code §13101); Wolters Village Mgmt. Co. v. The Merchants and Planters Nat'l Bank, 223 F.2d 793 (5th Cir. 1955) (applying Texas law, which adopted the U.C.C. in 1966, Tex. Bus. & Comm'l Code § 10-101).

10

U.S. Bankruptcy Court - Hawaii   #09-90059   Dkt # 56   Filed  07/16/10   Page 10 of 20

446104 (Mass. Super. February 1, 2006). The joint check agreement in this case contradicts this theory ("This Agreement does not constitute an assignment of funds . . . ."). Further, the parties agreed that Arakaki would make its checks payable jointly to C&S and Consolidated; if there was an absolute assignment, it would make no sense to make C&S a payee of the checks. Further, article 9 applies even to absolute assignments of accounts, Haw. Rev. Stat. § 490:9-109(a)(3).

Other courts reason that the joint check agreement impresses a trust upon the funds due from the prime contractor to the subcontractor. In re Inca Materials, Inc., 880 F.2d 1307(per curiam); Mid-Atlantic Supply, Inc. v. Three Rivers Aluminum Co., 790 F.2d 1121; In re Mastercraft Metals, Inc., 114 B.R. 183 (Bankr. W.D. Mo. 1990). This theory is inconsistent with Haw. Rev. Stat. § 490:9-109(a)(1), which provides that article 9 "applies to [a] transaction, regardless of its form, that creates a security interest in personal property or fixtures by contract [emphasis added] . . . ." See also Haw. Rev. Stat. § 490:9-109 comment 2 ("When a security interest is created, this Article applies regardless of the form of the transaction or the name that parties have given to it."); Haw. Rev. Stat. § 490:9-102 comment 3b ("Whether an agreement creates a security interest depends not on whether the parties intend that the law characterize the transaction as a security

11

interest but rather on whether the transfer falls within the definition of 'security interest' in section 1-201.") Parties cannot avoid the requirements of article 9 simply by agreeing (or arguing after the fact) that they created a trust rather than a security interest.

A third theory is that the joint check agreement in substance creates a direct contract between the supplier and the general contractor, replacing the supplier's contract with the subcontractor. <u>Martin v. Amercable Corp.</u>, 990 F.2d 439 (8th Cir. 1993). Consolidated adopts this argument in its supplemental memorandum, contending that, under the joint check agreement, C&S' obligation to pay Consolidated for the equipment was "extinguished and replaced" with Arakaki's obligation. The joint check agreement refutes this theory, because it specifically provides that "the execution of this Agreement and the taking of such joint checks shall not affect nor otherwise impair any bond, lien or other creditor rights and remedies which [Consolidated] now has or may hereafter have arising from its sales to [C&S] of material for the Project." Thus, Consolidated reserved all of its claims against C&S and reiterated that it was selling materials to C&S, not Arakaki. Also, this theory cannot explain the fact that C&S was still a joint payee of Arakaki's checks; if the contract between C&S and Consolidated was replaced, why weren't the checks made solely to Consolidated? Moreover, the joint check

12

agreement does not specify any terms of the imputed replacement contract between the general contractor and the supplier; it does not even refer to, let alone incorporate by reference, the supply contract between Consolidated and C&S.[3]

Although these theories are not persuasive, there are three reasons which justify the distinctive treatment of joint check agreements in the construction context.

First, a closer reading of the joint check agreement indicates that it does not create a security interest and therefore is not a security agreement. A security interest is an "interest in personal property or fixtures," § 490:9-1-201. The joint check agreement does not say that it creates an interest in any particular property. In order to characterize the joint check agreement as a security agreement, one has to infer that the parties intended to create an interest in C&S' claims against Arakaki, but there is no express grant of such an interest.

Second, as a matter of construction law, a general contractor has obligations

---

[3] Martin attempts to reconcile its approach with the U.C.C. by stating that "[t]his decision does not damage the protections of the U.C.C. because [the secured creditor's] remedy under the U.C.C. was to foreclose his lien while the [material] was in [the subcontractor's] possession, a step he apparently did not take." Martin, 990 F.2d at 441, n. 2. This ignores the facts that the secured creditor had a security interest in the proceeds of the material, not just the material itself, and on the subcontractor's accounts. It also ignores that fact that, if the court's reasoning is right, the material did not belong to the subcontractor any more than the payment for the material did, so the secured creditor could not have foreclosed on it.

13

U.S. Bankruptcy Court - Hawaii     #09-90059     Dkt # 56     Filed  07/16/10     Page 13 of 20

that differ from those of the usual account debtor.[4] In the typical situation where accounts are used as collateral, the account debtor owes money to its account creditor, but has no independent, preexisting liability to the secured creditor of its account creditor. In other words, suppose A owes a debt to B which qualifies as an "account," and B borrows money from C secured by B's accounts. A has no liability to C (until C enforces its security interest in the account and notifies A to pay the account to C rather than to B).

In the construction situation, the account debtor may have at least indirect responsibility to the creditors of its creditor. Suppose A is a general contractor, B is a subcontractor, and C is a supplier to B. In the absence of a joint check agreement or similar arrangement, A has no direct liability to C, but A may nevertheless be responsible to see that C's claims are paid. This responsibility could arise from a provision in A's contract with the owner. For example, in this case, Arakaki's contract with BWS required Arakaki to guarantee payment of all subcontractors and suppliers. The responsibility could also stem from a statute, such as Haw. Rev. Stat. § 103D-324 (Hawaii's "Little Miller Act"), which requires contractors on public works projects to post a bond "for the protection of all persons supplying labor and materials to the contractor for the performance of the

---

[4]Keenan Pipe alludes to this theory, 241 F.2d at 490, but does not elaborate on it.

14

U.S. Bankruptcy Court - Hawaii   #09-90059   Dkt # 56   Filed  07/16/10   Page 14 of 20

work provided for in the contract," or a statute allowing subcontractors and suppliers on private projects to assert liens against the project. These contractual and statutory provisions may not make the general contractor directly liable to the subcontractors and suppliers, but they certainly expose the general contractor to liability if the subcontractors and suppliers aren't paid.

This helps explain why a general contractor may be willing to enter into a joint check agreement. The joint check agreement benefits the lower tier parties by creating a direct claim against the general contractor, giving them additional assurance that their claims will be paid. The subcontractor benefits because the general contractor's undertaking to pay the sub-subcontractors and suppliers gives the subcontractor a "credit enhancement," potentially allowing the subcontractor to carry out its contract more easily and cheaply. The general contractor benefits from protection against the risk that the subcontractor might take the general contractor's payments and keep the money, leaving its sub-subcontractors and suppliers unpaid, and forcing the general contractor to pay twice.

Under this view, a joint check agreement is not intended to secure the subcontractor's obligation to pay the third tier parties (although it gives those parties greater assurance that their claims against the subcontractor will be paid). Instead, the agreement reinforces the general contractor's duty to the owner to get

15

them paid and creates a mechanism for the general contractor to perform that duty.

Based on the economic substance of the transaction, a joint check agreement in the construction context should not be treated as an agreement securing the subcontractor's obligations to its suppliers, but rather as an agreement which specifies how the general contractor will perform its own obligation to ensure that all third- and lower tier parties are paid.

Third, even if the joint check agreement is subject to the Uniform Commercial Code, the supplier still has priority. C&S can encumber assets only to the extent of C&S' interest in those assets and no more. C&S' interest in the amounts owed by Arakaki is subject to the Joint Check Agreement. Any assignment or grant of a security interest in C&S' accounts is subject to that interest. CPB, therefore, took its security interest in C&S' accounts subject to the joint check agreement. See §§9-403, 9-404; Commercial Law League of America, Gen. Editors, Commercial Law and Practice Guide Ch. 2, §29.04 (Matthew Bender)(explaining "the contractor's right to receive the money is subject to the owner's right to offset for cost overruns and to pay unpaid subcontractors; the secured party's rights are similarly limited and, for that reason, often turn out to be worthless.").

Therefore, I conclude that CPB's security interest does not attach to the

U.S. Bankruptcy Court - Hawaii   #09-90059   Dkt # 56   Filed  07/16/10   Page 16 of 20

amounts which Arakaki is obligated to pay Consolidated under the joint check agreement.

 2. **Arakaki's Countermotion for Summary Judgment**

 A. <u>Arakaki's Setoff Rights against C&S</u>

Arakaki argues that it can reduce its liability to C&S on the Waihee job by the amount of damages C&S owes to Arakaki on the other three jobs.

Setoff is a common sense principle. If A owes B money, and B also owes A money, only the net amount must be paid in cash. Setoff does not work, however, if A owes B money and B owes C money. A cannot reduce A's debt to B by netting out B's debt to C, because A is not entitled to collect B's debt to C.

Stated in more technical terms, under section 553 of the Bankruptcy Code and Hawaii law, only "mutual" debts are subject to offset. Mutuality requires that the debts be owed to and by the same parties in the same capacities. "Triangular setoff", generally where A attempts to offset an obligation owed by B against B's debt to C, is not permitted. <u>Steadfast Ins. Co. v. Woodside Group, LLC</u>, (In re Woodside Group, LLC), 2009 Bankr. LEXIS 4360, *13 (Bankr. C.D. Cal. Dec. 30, 2009).

Arakaki admits that it "assigned" the Makakilo and Waipio jobs to Brian's Contracting, Inc., apparently a related entity. The terms of the "assignment" are

17

not part of the record. Therefore, one cannot tell whether Arakaki or Brian's is entitled to collect any money which C&S owes on the other jobs. Without knowing whether Arakaki retained any claims against C&S in respect of those jobs, it is impossible to determine whether setoff still applies to the claims arising out of those jobs.

Arakaki points out that, under its contracts with BWS, Arakaki could not assign its obligations without BWS' consent, and even if BWS gave its consent, Arakaki would continue to be liable for performance of the contracts. This does not preclude the possibility that Arakaki transferred some or all of its claims or defenses against C&S to Brian's.

I will therefore grant partial summary judgment to Arakaki and hold that Arakaki may reduce its liability to C&S under the Waihee job by the amount (if any) of C&S' liability to Arakaki on the Maunalani job (which Arakaki did not assign to Brian's), but deny summary judgment on this issue as to the claims arising out of the assigned jobs (Makakilo and Waipio).

### B. Priority of Arakaki's Setoff Rights against CPB

Arakaki contends that it did not receive notice of CPB's security interest in C&S' accounts until sometime after C&S filed its bankruptcy petition. Arakaki argues that, by virtue of Haw. Rev. Stat. § 490:9-404, Arakaki's setoff rights (if

18

U.S. Bankruptcy Court - Hawaii   #09-90059   Dkt # 56   Filed  07/16/10   Page 18 of 20

any) have priority over CPB's security interest. CPB apparently concedes this point, so Arakaki is entitled to partial summary judgment on this legal issue.

## CONCLUSION

1. Genuine issues of material fact preclude partial summary judgment on the question whether the "Unconditional Waiver and Release upon Final Payment" is valid.

2. If the release is valid, Arakaki is entitled to summary judgment in its favor on Consolidated's counterclaim (and its mirror image, count 6 of the complaint).

3. If the release is ineffective, Consolidated is entitled to summary judgment in its favor and against Arakaki on the counterclaim and count 6 of the complaint in the amount of $64,894.41 plus interest and reasonable attorneys' fees and costs under Haw. Rev. Stat. § 607-14.

4. Consolidated, not CPB or C&S' bankruptcy estate, is entitled to recover the amount set forth in paragraph 3.

5. Arakaki is entitled to set off its liability (if any) to C&S on the Maunalani job against its claims against C&S on the Waihee job. Genuine issues of material fact preclude partial summary judgment on the issues of setoffs arising out of the Makakilo and Waipio jobs.

19

6. Arakaki's setoff right against C&S (if any) have priority over CPB's interest in C&S's accounts and other assets.

/s/ Robert J. Faris
United States Bankruptcy Judge
Dated: 07/15/2010